UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | | |
|---|---|---|
| MICHAEL A. STANLEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 2:08-cv-195 |
| | ) | |
| CITY OF PORTAGE INDIANA, DAMON | ) | |
| WASILEWSKI, GREGORY COLEMAN, | ) | |
| CHRISTIAN IRSA, JAMES C. EAGEN, | ) | |
| EMERITO BELTRAN, ROSS HAYNES, | ) | |
| and LISA DUNCAN, | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

On July 2, 2006, Plaintiff Michael Stanley was arrested by Portage, Indiana police officers in the cabin of boat whose name – the Quick Decision III – is imbued, in retrospect, with a bit of irony. The quick decisions made by the officers in the course of the arrest included forcibly restraining Stanley and tasering him in the abdomen. Stanley left the arrest with a broken jaw and bruises covering his body.

Stanley believes that the officers use of force was excessive and filed a complaint with this Court alleging as much. The Defendants have now moved for summary judgment. Stanley's opposition to this motion argues that there are disputed issues of fact sufficient to preclude summary judgment against six of the officers (Defendants Irsa, Beltran, Eagen, Wasilewski, Haynes, and Coleman) for excessive force and against three of the officers (Wasilewski, Haynes, and Coleman) for failure to intervene. For the reasons detailed below, the Defendants' motion is granted in part and denied in part.

## BACKGROUND

Stanley was spending the weekend of July 1 and 2, 2006 on his boat at Doyne's Marina in Portage. [DE 57-1 at 14-17.] Stanley also had two jet-skis with him. [*Id.*] During the day on July 2, Stanley went out on the lake on one of his jet skis and later had food and drinks with friends, including Keith Lonnon, who owned the "Quick Decision III." [*Id.*] In the evening, Stanley went out jet skiing again, this time with Lonnon. [*Id.*] Around 11:00 p.m., the Portage Police Department received a complaint that two jet skiers were creating a wake in a no-wake zone. [DE 56-5 at 9.] Officers James Eagen, Ross Haynes and Christian Irsa responded to the call and proceeded to the boardwalk in an attempt to locate the jet skiers on the waterway. [*Id.* at 10-15.] Eagen observed one jet ski approximately 30 to 60 yards away and began shouting commands identifying himself as a police officer and commanding the jet skier to stop. [*Id.*] The officers aimed their flashlights on the jet skier who initially slowed down but then sped up and continued on past the officers' location and back towards the marina. [*Id.*]

At that point, Officer Haynes radioed Officer Beltran to go to the marina, and Eagen, Haynes, and Irsa all headed there as well. [*Id.* at 17-18] Eagen told Beltran that the subject was a white male on a yellow jet ski. [*Id.*] When Beltran arrived at the marina he observed a white male wearing shorts with no shirt standing on the dock. [DE 56-2 at 14-18.] Beltran yelled, "Stop, police!," at which point the suspect took off running. [*Id.*] Beltran pursued the suspect until the suspect jumped onto the back of the Quick Decision III and went into the cabin. [*Id.*] Beltran stopped at the dock behind the boat, pointed his flashlight at the cabin's glass door, and yelled for the suspect to raise his hands and come out of the cabin. [*Id.*] The suspect did not come out of the cabin. [*Id.*]

Officer Damon Wasilewski then arrived at the scene with his police dog. [DE 56-8 at 10-13.] Beltran and Wasilewski remained on the dock behind the Quick Decision III and waited as Eagen, Irsa, and Haynes arrived, who were followed by a sixth officer, Gregory Coleman. [*Id.*] The officers gave further verbal commands for the suspect to come out of the cabin, which the suspect refused. [DE 56-5 at 20-22.] Haynes and Coleman remained on the dock while the other four officers boarded the boat and positioned themselves on the deck area as follows: Irsa was just to the left of the door leading down to the cabin, Beltran was to Irsa's right, Wasilewski and his dog were behind Beltran, and Eagen was to the left behind Irsa. [DE 56-2 at 19; DE 56-5 at 21; and DE 56-7 at 23.] Once on the boat, the officers continued to give verbal commands for the suspect to come out of the cabin. [DE 56-7 at 23.]

Stanley's deposition testimony tells a different story leading up to this point in the night. Stanley testified that he was out on his jet ski but needed to return to the marina to use the bathroom. [DE 57-1 at 17-22.] As he was returning to the marina, he heard indistinct shouting from the shore, but he didn't think much of it as, apparently, people yell from the shore all the time. [*Id.*] Stanley testified that he then docked his jet ski, went to his friend's boat (the Quick Decision III), used the restroom in its cabin, laid down on one of the two beds in the cabin, and promptly dozed off. [*Id.*] He then awoke some time later to shouting and the sounds of a dog scratching at the door. [*Id.*] Stanley, confused, came to the sliding glass door of the cabin. [*Id.*]

The parties agree at that point that Stanley told the officers to get off the boat. [*Id.*] The parties also agree that Stanley, who was standing slightly below the glass door on the steps leading down to the cabin, opened the door slightly and told them again to get off the boat, at which point Irsa forced the door open further. [*Id.*] Irsa testified that he then reached down,

3

grabbed Stanley by the wrist, and told him he was under arrest. [DE 56-7 at 25.] Stanley testified, however, that he was grabbed by the throat. [DE 57-1 at 20.]

Irsa and Stanley then fell down the stairs into the cabin. [*Id.*] Irsa testified he lost his balance and fell because Stanley quickly pulled his arm down and away, at which point he fell forward while pushing Stanley away from him. [DE 56-7 at 27-30.] Stanley testified that he stepped back after being grabbed by the throat and that Irsa then fell on top of him. [DE 57-1 at 20.] At that point, according to the officers, a melee ensued: while Irsa attempted to subdue and handcuff Stanley, Stanley kicked and hit Irsa in the face and upper chest and Irsa struck Stanley in the head or face, all of which ended with Stanley being tased in the abdomen by Beltran (who had followed them into the cabin). [DE 56-2 at 21-25; DE 56-7 at 32-36.] Stanley's testimony was markedly different. He says that after Irsa fell on top of him he was beaten and tased, all without putting up any resistance at all.[1] [DE 57-1 at 20.]

After being tased, Stanley was handcuffed by Eagen, who had followed the other officers into the cabin. [DE 56-5 at 44-45.] Coleman and Irsa then took Stanley to Coleman's car, and Coleman drove Stanley to the Porter County Jail. [DE 56-3 at 15-17.] After Stanley was taken off the boat, Officer Lisa Duncan arrived at the scene and assisted the other officers with a search of the Quick Decision III to determine its owner. [DE 56-4 at 7-8.]

---

[1]Although Stanley argues in his Response that "at least three Police Officers" kicked, punched, choked and tased him in the cabin [DE 57 at 10], his deposition testimony indicates that he does not know which or how many officers allegedly used excessive force. *See* DE 57-1 at 20-25.

**DISCUSSION**

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "At summary judgment, 'a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder.'" *Paz v. Wauconda Healthcare and Rehab. Ctr., LLC*, 464 F.3d 659, 664 (7th Cir. 2006) (quoting *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003)). Moreover, this Court must construe "the record in the light most favorable to the nonmovant" and avoid "the temptation to decide which party's version of the facts is more likely true." *Payne*, 337 F.3d at 770 (noting the oft-stated proposition that "summary judgment cannot be used to resolve swearing contests between litigants").

To begin with, Stanley does not dispute that a number of the claims in his Complaint can be dispensed with at this time, including his Fourth Amendment claim for false arrest, and his claims against officer Lisa Duncan (who only arrived at the scene after Stanley had already been taken away). As for the claims against the City of Portage, Stanley's Amended Complaint alleges *respondent superior* liability against the City, but, as a municipality, Portage cannot be held liable under a *respondeat superior* theory for constitutional violations committed by its employees. *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). *See also Wragg v. Vill. of Thornton*, 604 F.3d 464, 467 (7th Cir. 2010) (citing *Monell*). And Stanley has failed to submit any evidence that would indicate that his rights were violated via an unconstitutional policy, custom or practice. *Id.* I can thus summarily dismiss all of those claims

5

and parties and move on to what Stanley argues are his two core remaining causes of action – excessive force and failure to intervene.

      **1.**      **Excessive Force.**

A claim that a police officer has used excessive force in the course of an arrest or other "seizure" is addressed to the reasonableness of the seizure, under the standards established by the Fourth Amendment. *Graham v. Connor*, 490 U.S. 386, 395 (1989); *Abdullahi v. City of Madison*, 423 F.3d 763, 768 (7th Cir. 2005). An officer's use of force is unreasonable from a constitutional point of view only if, "judging from the totality of circumstances at the time of the arrest, the officer used greater force than was reasonably necessary to make the arrest." *Lester v. City of Chicago*, 830 F.2d 706, 713 (7th Cir. 1987). The reasonableness inquiry involves a "careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396 (internal quotation marks omitted). Courts must give "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* A factual inquiry into an excessive force claim "nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom . . . ." *Abdullahi*, 423 F.3d at 773 (internal quotation marks omitted).

It is clear from the record that three of the six officers that were on the scene did not participate in the arrest. Haynes, Wasilewski, and Coleman were on the deck of the boat when Stanley's arrest took place. Coleman did help to get Stanley off the boat, but there is no

6

allegation that this contact resulted in any personal injury, let alone excessive force. Similarly, Eagen's only participation in the arrest was handcuffing Stanley after he has already been tasered, and there is no allegation that this contact resulted in any personal injury, let alone excessive force. Stanley's deposition testimony, in which he states he does not know exactly how many officers used force on him other than that there "were a lot" [DE 57-1 at 20], is insufficient to rebut the specific deposition testimony of these officers's as to their position on the boat and their involvement in the arrest. Thus, with respect to the excessive force claims made against Haynes, Wasilewski, Coleman, and Eagen, the evidence shows that there is no genuine issue of material fact and that judgment is appropriate as a matter of law.

The rest of the case, however, amounts to nothing more than a swearing contest. Irsa admits that he used force in arresting Stanley, and Beltran admits to tasering Stanley. The officers claim that their force was reasonable because Stanley was "kicking, punching and slapping at Irsa in an attempt to get away." [DE 55 at 8.] But Stanley claims that as soon as he and Irsa fell back into the cabin he was, without provocation, kicked, punched, choked, and tased. [DE 57 at 10.] He further claims that he offered no resistance to the assault. Given this disputed factual backdrop, I can't give "careful attention to the facts and circumstances," *Graham*, 490 U.S. at 396, because I don't yet know definitively what the "facts and circumstances" are. That is, in order to know whether the officers use of force was reasonable, I would have to choose one of the competing versions of events. That, of course, is what a trial is for. *See*, *e.g.*, *Gonzalez v. City of Elgin*, 578 F.3d 526, 539-40 (7th Cir. 2009) (reversing district court's grant of summary judgment because, "[t]aking the facts in the light most favorable to the

7

plaintiffs, a jury could find that the defendant officers used excessive force in the course of the plaintiffs' arrest").

For the same reasons, qualified immunity will not protect Irsa and Beltran at this stage in the case. The Supreme Court has identified two key inquiries for assertions of qualified immunity: (1) whether the facts, taken in the light most favorable to the plaintiff, show that the defendants violated a constitutional right; and (2) whether that constitutional right was clearly established at the time of the alleged violation. *Pearson v. Callahan*, 555 U.S. 223, 129 S.Ct. 808, 815-16 (2009); *Saucier v. Katz*, 533 U.S. 194, 201 (2001). *Pearson* held that the court may decide these questions in whatever order is best suited to the case at hand. *Pearson*, 129 S.Ct. at 818. The first question is one of law, while the second requires a broader inquiry.

With respect to the first question, a seizure for purposes of the Fourth Amendment is unreasonable if it is accomplished through the use of excessive force. *See*, *e.g.*, *Los Angeles County, California v. Rettele*, 550 U.S. 609, 614 (2007) ("Unreasonable actions include the use of excessive force or restraints that cause unnecessary pain or are imposed for a prolonged and unnecessary period of time."). Stanley's version of events sufficiently meets that criteria, so we move to the second inquiry under *Pearson* and *Saucier*: was this right clearly established at the time these defendants acted? A plaintiff can demonstrate that a constitutional right was clearly established by showing that there is "a clearly analogous case establishing a right to be free from the specific conduct at issue" or that "the conduct is so egregious that no reasonable person could have believed that it would not violate clearly established rights." *Smith v. City of Chicago*, 242 F.3d 737, 742 (7th Cir. 2001). Once again, I must accept Stanley's account of the events at this stage, and his version of events certainly constitutes conduct "so egregious that no

reasonable person could have believed that it would not violate clearly established rights." *Id.* Many other cases in the Seventh Circuit have denied qualified immunity on similar grounds. *See, e.g., Gonzalez*, 578 F.3d at 541 ("[I]t is clearly established that officers may not, without provocation, start beating, pepper-spraying, kicking, and otherwise mistreating people standing around a restaurant parking lot."); *Clash v. Beatty*, 77 F.3d 1045, 1048 (7th Cir. 1996) ("It is clear . . . that police officers do not have the right to shove, push, or otherwise assault innocent citizens without any provocation whatsoever.").

Thus, while Irsa and Beltran may be entitled to qualified immunity if the factfinder accepts their account of Stanley's arrest, they are not entitled to such protection at this stage in the case. Stanley's excessive force claims against Irsa and Beltran will therefore proceed to trial.

### 2. Failure to Intervene

Stanley also argues that his failure to intervene claims against Haynes, Coleman, and Wasilewski must go forward.[2] It is true that an officer has a duty under § 1983 "to intervene to prevent a false arrest or the use of excessive force if the officer is informed of the facts that establish a constitutional violation and has the ability to prevent it." *Morfin v. City of East Chicago*, 349 F.3d 989, 1001 (7th Cir. 2003). But Stanley has not produced sufficient evidence that these three officers "had reason to know . . . excessive force was being used . . . *and* . . . had a realistic opportunity to intervene to prevent the harm from occurring." *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994).

Stanley has not directed me to any evidence that would establish that Haynes, Coleman, and Wasilewski could be liable for failure to intervene. On the contrary, as discussed above, the

---

[2]Stanley's Response makes no assertion that he has any failure to intervene claims against Eagen, Irsa or Beltran. *See* DE 57 at 10-15.

unrebutted evidence establishes that these officers were all on the deck of the boat while Stanley's arrest occurred below in the cabin. Under these circumstances – in which the officer did not actually witness the arrest – the officers had no way of knowing if the arresting officers were using excessive force nor did they have any realistic opportunity to intervene. *See, e.g., Montano v. City of Chicago*, 535 F.3d 558, 569-70 (7th Cir. 2008) (no evidence or inference that an officer sitting as a passenger in a police van knew that another officer was intentionally injuring the plaintiffs in the back of the van or that he had a realistic opportunity to prevent the alleged harm). *Cf. Abdullahi*, 423 F.3d at 774 (failure to intervene claim should have proceeded to trial where officers witnesed the arrest and "were mere feet away from [Plaintiff] while the conduct in question occurred").

Thus, Stanley's failure to intervene claims will be dismissed.

## CONCLUSION

For the foregoing reasons, the Defendants' Motion for Summary Judgment [DE 54] is **GRANTED in part** and **DENIED in part**. The clerk shall **ENTER FINAL JUDGMENT** in favor of Defendants Portage, Indiana, Lisa Duncan, Ross Haynes, James Eagen, Gregory Coleman, and Damon Wasilewski. The claims brought by Plaintiff for excessive force against Christian Irsa and Emerito Beltran survive summary judgment, as described more fully above, and shall proceed to trial. As previously set in my Order of August 31, 2010, trial will begin on April 4, 2011 at 8:30 a.m. All parties are reminded of their obligation to file a timely pretrial order. They are furthered reminded that the final pretrial conference and settlement conference are set for March 10, 2011 at 9:30 a.m.

**SO ORDERED**.

ENTERED: March 3, 2011.

                                                        s/ Philip P. Simon
                                                        PHILIP P. SIMON, CHIEF JUDGE
                                                        UNITED STATES DISTRICT COURT